**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

B. STANLEY MCCULLARS,

        Plaintiff,

v.                                          Case No: 6:17-cv-1587-Orl-40GJK

GRANT MALOY,

        Defendant.
_____/

## ORDER

This cause comes before the Court without oral argument on the parties' cross-motions for summary judgment, and the responses and replies thereto. (Docs. 51, 53, 63, 65–67). With briefing complete, the matter is ripe. Upon consideration of the record as cited by the parties in their respective briefs, the Court finds that Defendant's motion is due to be granted in part and denied in part, and Plaintiff's motion is due to be denied.

**I.    BACKGROUND**

Plaintiff B. Stanley McCullars brings this 42 U.S.C. § 1983 action against Defendant Grant Maloy, individually and in his official capacity as Clerk of the Circuit Court and Comptroller of Seminole County, Florida (the "**Clerk**"), for alleged First Amendment violations. (Doc. 1). This suit arises from Plaintiff's controversial social media comments that precipitated the end of his employment with Defendant.

In April 2016, Plaintiff was hired as assistant financial director for the Clerk. (Doc. 43-1, 32:5–7, 37:7–8). This position involved primarily finance- and accounting-oriented duties. (Doc. 50-1, ¶ 2). Plaintiff managed employees, worked with banks and auditors, and attended commission meetings. (Doc. 33-1, 23:19–24, 33:14–34:21, 120:7–11; Doc.

50-1, ¶ 2). As Plaintiff put it, the "vast majority of time was spent reviewing invoices for payment." (Doc. 43-1, 44:12–15). Unsurprisingly, Plaintiff's position called for little to no contact with the public and did not entail policy-making. (Doc. 33-1, 33:14–34:21; Doc. 43-1, 43:12–15, 44:12–15).

## A. The Posts

On March 16, 2017, State Attorney Aramis Ayala declared publicly that her office would not seek the death penalty in capital murder cases. (Doc. 1, ¶ 14). In response, on March 19, 2017, Plaintiff posted comments from his Facebook account[1] criticizing the decision. (Doc. 1, ¶¶ 12–14, 17). Specifically, Plaintiff wrote that Ayala, a black woman, "should get the death penalty," and "should be tarred and feathered if not hung from a tree." (*Id.* ¶ 17; Doc. 43-1, 94:19–95:19, 97:22–98:2). Later that same night, Plaintiff made another Facebook post that said: "Yep, it was wrong for me to post that. I let my anger at her efforts to thwart justice get the better of me. No excuses." (Doc. 50-1, ¶ 17). Plaintiff strenuously denies that the post was racially motivated, claiming that he was unaware of Ayala's race when he made the posts. (Doc. 43-1, 90:16–21, 95:2–6, 144:15–145:9, 178:4–179:19; Doc. 50-1, ¶ 14). The posts were deleted by a third party shortly after they were posted. (Doc. 43-1, 111:8–16).[2]

After the posts spread and their author was identified as a Clerk's Office employee, the Clerk felt the backlash. (Doc. 33-1, 95:21–96:4; Doc. 34-1, 12:23–13:4; Doc. 44-1, 32:2–13). On March 20, 2017, the Clerk's Office's "phone[]s [were] ringing off the hook"

---

[1] Plaintiff's Facebook profile identified Plaintiff as a Clerk's Office employee. (Doc. 35-1, 11:6–21).

[2] Although Plaintiff attested in his affidavit that he deleted the posts (Doc. 50-1, ¶ 18), this misstatement was corrected at Plaintiff's deposition.

2

with complaints; email complaints also came flooding in. (Doc. 33-1, 61:24–62:7, 95:21–96:4; Doc. 36-1, 15:3–10, 32:4–20, 43:4–7).[3] The posts were widely condemned as racist. (Doc. 36-1, 28:1–9, 47:21–58:7; Doc. 44-1, 29:19–23; Doc. 46-1, 23:5–24; Doc. 58-1, 60:6–12). The barrage of phone calls overloaded Defendant's phone lines for approximately a week. (Doc. 36-1, 32:4–14, 42:1–23). The overwhelming majority of the calls and emails complained about Plaintiff's posts, and many called for his termination. (Doc. 36-1, 28:4–9, 42:15–23, 44:9–13; Doc. 40-1, 19:20–20:4).[4]

Ms. Ayala, herself, perceived Plaintiff's posts as racially charged and threatening. In an affidavit, she likened the posts to "a call for [her], an African American public official, to be lynched." (Doc. 47-1, ¶ 7). At her deposition, Ms. Ayala opined that the posts constituted a threat against a public official, which is a crime under Florida law. (Doc. 58-1, 45:10–13). Ms. Ayala took extraordinary safety precautions around the time of the posts in response to a rash of "threatening messages" she received in the wake of the March 16, 2017, press conference. (*Id.* 50:13–52:14). Defendant apologized to Ms. Ayala on behalf of the Clerk's Office, but Ms. Ayala refused to speak with Defendant, and instead her office voiced a complaint to Defendant. (Doc. 33-1, 74:4–13; Doc. 47-1, ¶¶ 10–11; Doc. 58-1, 45:21–24).

Some of Plaintiff's coworkers likewise took offense to the posts. Jenny Spencer, Director of Finance for the Clerk and Plaintiff's supervisor, testified that she could no

---

[3] The Clerk's Office received emails from approximately seventy people. (Doc. 36-1, 50:7–19).

[4] Plaintiff contends that "there is evidence that individuals called in support of McCullars' free speech." (Doc. 53, p. 7). In support, Plaintiff submitted a note describing one caller's sentiments as follows: "Stated he hears that you don't believe in freedom of speech based on Stan being let go. . . . He is not happy." (Doc. 52, p. 2).

3

longer work with Plaintiff because of the post. (Doc. 45-1, 8:15–17, 24:9–11, 33:8–23).[5] Similarly, Jenna Riaz, a co-employee at the Clerk's Office who had daily contact with Plaintiff, submitted an affidavit stating that she was offended by Plaintiff's posts and "would have been uncomfortable working with [Plaintiff] after that if he had returned to work." (Doc. 48-1, ¶ 1–5). However, Ms. Riaz' stated discomfort about working alongside Plaintiff is at odds with various friendly text messages exchanged between them after the posts. (Doc. 64-1, ¶ 12, pp. 31–34).

Defendant viewed Plaintiff's posts the night they were posted after a third party forwarded the posts to him. (Doc. 33-1, 54:22–56:7). In light of the content of the posts and public backlash, Defendant became concerned that the ordeal would damage the Clerk's Office's integrity. (*Id.* 113:3–10).

### B. Plaintiff and Defendant Part Ways

On March 20, 2017, the day after Plaintiff made the posts in question, Defendant put Plaintiff on administrative leave pending an internal investigation. (Doc. 33-1, 73:17–19, 95:2–6, 95:17–20, Exhibit 1; Doc. 42-1, 42:3–6). The letter documenting Plaintiff's administrative leave placement cited "the Clerk's [O]ffice['s] recei[pt of] numerous phone calls in reference to inappropriate and/or inflammatory commentary posted on social media that was purported to be authored by [Plaintiff]." (Doc. 33-1, p. 146). That same day, the Clerk issued a memorandum notifying Clerk's Office employees that Plaintiff was "no longer . . . permitted" employee access to Clerk's Office facilities and that Plaintiff could not enter such locations except during business hours. (Doc. 38-1, p. 38).

---

[5] In his testimony and second affidavit, Plaintiff asserted that Ms. Spencer told him "let's just hope this blows over," "this too will pass," or something to that effect. (Doc. 43-1, 186:22–187:1; Doc. 64-1, ¶ 8).

4

On March 21, 2017, Defendant came to the conclusion that Plaintiff's continued employment would have a "detrimental effect" on the Clerk's Office. (Doc. 33-1, 95:17–96:10, 97:8–15). Therefore, Defendant directed Susan Dietrich and Lia Denning to discuss Plaintiff's exit. (*Id.* 97:8–15, 97:22–99:3). That same day, Plaintiff met with Dietrich and Denning, who presented him with a letter.[6] (*Id.* 100:22–25; Doc. 43-1, 127:24–129:21). The letter states:

> In light of the events occurring over the weekend of March 18–19, 2017[,] and continuing through the present, and completion of an internal investigation into said events by the Clerk's Office, we believe it to be in the best interests of the Clerk's Office to discontinue our employer/employee relationship at this time.
>
> Your separation benefits are as follows:
>
> - Paid Administrative Leave through March 24, 2017,
> - Paid Leave March 27, 2017[,] through April 3, 2017 (48 hours to be deducted from your PTO accruals*)
> - Paid 45.78 hours of the remainder of your PTO accruals (as of April 3, 2017[)]; and
> - Paid 80 hours of severance pay
>
> *to provide a separation date of April 3, 2017[,] which will result in extending your current health insurance benefit through April 30, 2017.

(Doc. 33-1, p. 145).

Plaintiff and Defendant disagree over the effect of the March 21, 2016, letter. Plaintiff contends it was a termination letter and that he was effectively fired at the meeting. (Doc. 43-1, 131:13–17; Doc. 65, pp. 2–4). Defendant disputes this characterization, insisting that the letter merely encouraged Plaintiff to resign in exchange for a package of severance benefits "that would not normally be offered to [terminated] employees." (Doc. 33-1, 97:22–98:1, 98:21–99:7; Doc. 43-1, 129:22–130:25). In any

---

[6] The letter was prepared by Dietrich, Denning, and Defendant. (*Id.* 98:2–99:12).

event, upon receipt of the letter, Plaintiff returned home and conferred with his wife—who is a lawyer—about the situation. (Doc. 43-1, 132:25–133:8).

Plaintiff submitted a resignation letter the next day. (*Id.* 133:10–134:4). The letter was addressed to Ms. Denning and provides in pertinent part:

> After considering the conversation we had yesterday, I agree that it is in our best interests for us to discontinue our employer/employee relationship at this time.
>
> Please consider this letter as my official resignation with an effective separation date of April 3, 2017.
>
> My social media posts of last weekend resulted in the Clerk and Clerk staff spending resources answering questions from some members of the public. I believe my resignation will help the Clerk's Office to more quickly return to the people's business.

(*Id.* at p. 288).[7] Plaintiff met Denning later that day to turn in his key and badge and retrieve his personal items. (Doc. 38-1, 32:21–33:12, p. 41).

After collecting the severance benefits, Plaintiff filed the Complaint, (Doc. 1; Doc. 43-1, 136:20–25), which asserts two Counts: a 42 U.S.C. § 1983 claim against Defendant, in his personal capacity, for wrongful discharge in violation of Plaintiff's First Amendment free speech rights (Count I); and a § 1983 claim against Defendant, in his official capacity as the Clerk, for wrongful discharge in violation of Plaintiff's First Amendment rights (Count II). (Doc. 1).

Both parties move for summary judgment on the Complaint. (Docs. 51, 53).

---

[7] Plaintiff discounted the significance of his own resignation letter at his deposition, stating: "I was fired on the 21st. And then on the 22nd, I wrote a letter to them saying, you know, I'm done." (*Id.* 134:5–11).

6

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the absence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Summary judgment is proper when a plaintiff fails to adequately prove up an essential element of their claim. *Celotex*, 477 U.S. at 322–23. The Court should refrain from credibility determinations and must "draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor." *Specialty Malls of Tampa v. City of Tampa*, 916 F. Supp. 1222, 1227 (M.D. Fla. 1996) (citing *Spence v. Zimmerman*, 873 F.2d 256,

257 (11th Cir. 1989)). Also, "[t]he court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam).[8]

## III. DISCUSSION

### A. Defendant's Motion for Summary Judgment

The Court begins with Defendant's Motion for Summary Judgment. Defendant seeks summary judgment on several grounds, arguing: (i) Plaintiff voluntarily resigned his employment with Defendant and therefore did not suffer the injury required to sustain his claims; (ii) Plaintiff's social media posts are not entitled First Amendment protection because they were made "within the scope" of his employment with the Clerk; (iii) Plaintiff cannot prevail because his interests in the speech at issue are outweighed by Defendant's interest in maintaining the efficient and effective operations of the Clerk's Office; and finally (iv) Defendant is entitled qualified immunity as to Count I because Defendant's conduct did not violate "clearly established" law. (Doc. 51).

#### 1. Adverse Employment Action

The Court first addresses the threshold question of whether Plaintiff suffered an adverse employment action—here, constructive or actual termination—which Plaintiff must show to prevail on his claims. *See Rodriguez v. City of Doral*, 863 F.3d 1343, 1350 (11th Cir. 2017). Defendant contends that Plaintiff voluntarily resigned and thus did not

---

[8] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

8

suffer an adverse employment action. (Doc. 51, pp. 7–8). The Court is not convinced, however, because genuine issues of material fact remain as to whether Plaintiff was actually terminated before he tried to resign.

"An actual discharge . . . occurs when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated.'" *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 794 F.2d 383, 385 (8th Cir. 1996)). The termination inquiry hinges on the employer's intent. *Id.* The Court must make this determination in view of the "particular circumstances of the controverted job action." *Id.* "While the words used by the employer and the label for the job action are relevant for determining whether a termination has occurred, . . . the lack of specific words is not dispositive." *Id.* at 1437 (citation omitted).

At the very least, genuine issues of material fact remain as to whether Defendant actually terminated Plaintiff before he resigned. In the wake of Plaintiff's social media post, Defendant put Plaintiff on administrative leave and conducted a short investigation, and then delivered Plaintiff a letter stating that Defendant "believe[d] it to be in the best interests of the Clerk's Office to discontinue our employer/employee relationship at this time." (Doc. 33-1, 73:17–19, 95:2–6, 100:22–25, pp. 145–46). The letter listed several "separation benefits," and although Defendant maintains that terminated employees are not entitled to comparable severance packages, Defendant has not identified evidence in the record showing that these benefits were contingent on Plaintiff resigning. (*Id.* at p.

145).⁹ Moreover, Plaintiff was adamant at his deposition that Dietrich and Denning told him he was fired (Doc. 43-1, 131:13–17), and Defendant's deposition testimony suggests that he intended to terminate Plaintiff at the March 21, 2016, meeting. (Doc. 33-1, 100:6–16, 101:5–102:12).¹⁰ In view of these circumstances, a prudent person in Plaintiff's position could have reasonably concluded that he or she had been terminated after the March 21, 2016, meeting. *See Thomas*, 116 F.3d at 1434.

What's more, Defendant's communications to other Clerk's Office employees—including the memorandums instructing employees that Plaintiff was "no longer . . . permitted" employee access to facilities—lend additional support to the conclusion that Plaintiff was actually terminated. *See Thomas*, 116 F.3d at 1437; (Doc. 38-1, p. 38). And although Plaintiff was not directly told he was fired, "the lack of specific words is not dispositive." *See Thomas*, 116 F.3d at 1437.

That Plaintiff submitted a "resignation letter" after he was arguably discharged does not alter the Court's analysis. There is ample evidence before the Court to support a reasonable jury finding that Defendant terminated Plaintiff before he resigned; and in that case, Plaintiff's resignation letter would be inoperative. *See Rodriguez*, 863 F.3d at 1355 (Jordan, J., concurring) ("And if the letter terminated his employment with the City, how could [the plaintiff] subsequently resign from a non-existent position?").

---

9   Defendant was apparently cognizant of the difference between voluntary resignation and termination (*see id.* 100:6–13 ("[The March 21, 2016, letter] doesn't point blank say, you're fired, but we believe it's best, here are some benefits if you so choose.")), but there is little indication that Plaintiff's resignation was being sought at the meeting.

10  (*See also id.* ("Q. Were you going to allow Mr. McCullars to come back to work on March 22? . . . A. No.").

## 2. *Comments Made as Employee or Private Citizen*

The Court next addresses whether Plaintiff's comments were made within the scope of his employment. If so, the First Amendment affords little protection. Defendant maintains that Plaintiff spoke as a Clerk's Office employee in the posts at issue, citing the employee handbook and McCullar's Facebook profile, which "clearly identified him as a Seminole County Deputy Clerk." (Doc. 35-1, 11:6–21; Doc. 43-1, pp. 264, 267; Doc. 51, pp. 8–10). Defendant's argument on this point is untenable because Plaintiff clearly spoke as a private citizen.

As the parties recognize, the protection afforded to government employees' speech depends on the context. When government employees speak "as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). On the other hand, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The *Garcetti* Court based this distinction on the long-recognized need for public employers to have discretion in controlling their operations:

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422–23. Public employee speech "ordinarily within the scope of [the] employee's duties" is therefore not afforded First Amendment protection. *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

The speech at issue in this case is orders of magnitude removed from the scope of Plaintiff's employment. *See id.* The posts concerned Plaintiff's opinion regarding, and response to, a Florida prosecutor's public statement and had nothing to do with Plaintiff's professional duties. Neither the employee handbook's instructions to avoid impropriety nor the information on Plaintiff's Facebook profile identifying him as a Deputy Clerk transform purely private speech into scope-of-employment speech. Therefore, the Court rejects Defendant's argument that Plaintiff made the social media posts in question as a public employee, depriving the speech of First Amendment protection.

### 3. Pickering *Balance*

Next, the Court addresses whether discharging Plaintiff based on the posts would violate the First Amendment, applying the framework set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968). It is well-settled that a public employer may not fire an employee "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To prevail on a wrongful termination claim based on protected speech, an employee must show, in part, that he or she (1) suffered an adverse employment action (2) because the employee engaged in protected speech. *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000). Having addressed the adverse employment element *supra*, the Court now turns to the protected-speech element.

Courts employ the so-called *Pickering* balancing test to discern whether a government employee's speech qualifies for First Amendment protection. Before any balancing, though, the Court must decide whether Plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern," triggering First

Amendment protection. *Rankin*, 483 U.S. at 384 (quoting *Connick*, 461 U.S. at 146). This determination is made in view of "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 384–85 (same). Defendant does not affirmatively dispute that Plaintiff's posts addressed a matter of public concern (*see* Doc. 51), and the record can only support the conclusion that it did. *See Rankin*, 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). Plaintiff's statements criticized a public official for a publicly-announced decision that generated significant media attention and spawned a clash between a Florida prosecutor and Florida's Governor that went up to the Florida Supreme Court.[11] The Court therefore finds that Plaintiff's speech addressed a matter of public concern, and next turns to the *Pickering* balancing test.

To prevail on his wrongful termination claim, Plaintiff must show by a preponderance of the evidence that his "first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees." *Stanley*, 219 F.3d at 1288. "In striking this balance, [the Court] consider[s] these factors: '(1) whether the

---

[11] The Court pauses to note that, although unpleasant, Plaintiff's posts do not constitute an unprotected "true threat"—especially after giving Plaintiff the benefit of the doubt as required at this stage. The First Amendment does not protect all speech touching on matters of public concern. For instance, "true threats"—"statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"—are not entitled to First Amendment protection. *Virginia v. Black*, 538 U.S. 343, 359 (2003). But while "true threats" are not protected, "political hyperbole" is. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court cannot find that the posts constituted a "true threat." *See Specialty Malls of Tampa*, 916 F. Supp. at 1227.

speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made.'" *Id.* at 1289 (quoting *Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir. 1989)). This balancing act requires a fact-intensive inquiry guided by few, if any, hard and fast rules. *Pickering*, 391 U.S. at 569.

The Court begins by assessing Plaintiff's interest in making the posts. Plaintiff undoubtedly had a legitimate interest in speaking on a matter of public concern. Plaintiff's posts, as an "expression on public issues '. . . rest[] on the highest rung of the hierarchy of First Amendment values." *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982); *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). On the other hand, the "vulgar" and caustic nature of the posts somewhat weakens Plaintiff's interest in making them. *See Hansen v. Soldenwagner*, 19 F.3d 573, (11th Cir. 1994) ("[T]he manner of a public employee's speech is an important element in the *Pickering* balance. Here, the outcome of a *Pickering* balance is especially uncertain because the manner of [the plaintiff's] speech was vulgar, insulting, and defiant." (citation omitted)). And while the Supreme Court has recognized "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," *Garcetti*, 547 U.S. at 419, Plaintiff's posts do not implicate this consideration as there is little evidence that the views Plaintiff expressed were particularly "well[ ]informed." *See id.*; (Doc. 43-1, 90:16–21, 95:2–6, 144:15–145:9, 178:4–179:19; Doc. 50-1, ¶ 14).

14

The nature of Plaintiff's position weighs in his favor. Plaintiff's job required little public contact, which means that his "burden of caution" with respect to his public speech was less than an official with significant public contact. *See Rankin*, 483 U.S. at 390–91. Indeed, *Sims v. Metro. Dade Cty.*, 972 F.2d 1230 (11th Cir. 1992), a case cited by Defendant in support of its motion, is inapposite because Plaintiff's position with the Clerk's Office called for little public contact unlike the *Sims* plaintiff's. *Cf. id.* at 1237 ("[W]hen the employee serves in a sensitive capacity that requires extensive public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning.").

Next, the Court considers Defendant's interests in censuring Plaintiff for the posts. The Clerk's Office requires "a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." *See Garcetti*, 547 U.S. at 418. Another weight on the scales is the prospect of disharmony among co-workers, manifested here by Ms. Spencer, Plaintiff's supervisor, testifying that she could no longer work with Plaintiff in light of his "racist" posts. *See Rankin*, 483 U.S. at 388; (Doc. 45-1, 8:15–17, 24:9–11, 33:8–23).[12] There is also evidence that the posts "interfere[d] with the regular operation of the [Clerk's Office]" because the barrage of angry phone call and email complaints disrupted several employees' work, *See Rankin*, 483 U.S. at 388; (Doc. 36-1, 32:4–14, 42:1–23), although

---

[12] Although Plaintiff attempts to contradict this testimony with self-serving statements attributed to Ms. Spencer from Plaintiff's deposition and affidavit, these hearsay statements may not be considered at summary judgment. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1203–94 (11th Cir. 2012); *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."); (Doc. 43-1, 186:22–187:1; Doc. 64-1, ¶ 8).

15

the extent of this disruption is hotly contested by the parties. Furthermore, Defendant saw the posts as damaging the integrity of the Clerk's Office, which is a relevant consideration. *Rankin*, 483 U.S. at 389 (suggesting that speech "discredit[ing]" a public employer would tend to justify remedial measures); (Doc. 33-1, 95:17–96:10, 97:8–15).

Because Plaintiff and Defendant both have legitimate interests on their respective sides of the *Pickering* scales, and since it is unclear whose interests are more robust, summary judgment is inappropriate. A reasonable jury could easily find for either party. Additionally, fact issues remain as to the degree of public contact Plaintiff's position entailed, Plaintiff's understanding of the posts, and the degree to which the posts disrupted the Clerk's Office's operations and generated workplace conflict. Resolution of these fact issues will impact the *Pickering* balance and therefore preclude summary judgment.

### 4. Qualified Immunity

Finally, Defendant moves for summary judgment as to Count I—the individual capacity claim—based on qualified immunity. (Doc. 51, pp. 15–24).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects all officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks

omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To do so, the plaintiff must make a two-part showing. First, the plaintiff must allege that the facts of the case, if proven to be true, would make out a constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, the plaintiff must show that the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.

Here, Plaintiff does not dispute that Defendant was "acting within the scope of his discretionary authority" when he terminated Plaintiff. (Doc. 65, pp. 15–19). Instead, Plaintiff principally argues that he has shown a "clearly established" constitutional violation. (*Id.*). The Court disagrees.

"Because no bright line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the *inevitable* conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir.1989) (emphasis added); *see also Stanley*, 219 F.3d at 1298; *Hansen*, 19 F.3d at 578; *Sims*, 972 F.2d at 1237. As the Court found *supra*, the outcome of the *Pickering* balance is anything but "inevitable." *See Dartland*, 866 F.2d at 1323. Because Defendant's actions did not violate clearly established law, Defendant is entitled to qualified immunity, and therefore summary judgment, as to the individual capacity claim—Count I of the Complaint.

B.  **Plaintiff's Motion for Summary Judgment**

Plaintiff moves for summary judgment on the issue of liability only. (Doc. 53, p. 24). As the Court found *supra* that the *Pickering* balance's outcome is unclear, Plaintiff is not entitled to summary judgment as to the remaining official capacity claim. In view of the myriad fact issues and substantial interests on both sides of the equation, this matter should be decided by a jury.

IV.  **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. 53) is **DENIED**.
2. Defendant's Motion for Summary Judgment (Doc. 51) is **GRANTED IN PART** and **DENIED IN PART**.
    a. Defendant's Motion for Summary Judgment as to Count I is **GRANTED**.
    b. In all other respects, Defendant's Motion for Summary Judgment is **DENIED**.
3. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Grant Maloy and against Plaintiff B. Stanley McCullars as to Count I only.

**DONE AND ORDERED** in Orlando, Florida on December 17, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record