UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

B. STANLEY MCCULLARS,

    Plaintiff,

v.                                                    Case No: 6:17-cv-1587-Orl-40GJK

GRANT MALOY,

    Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Judgment as a Matter of Law, pursuant to Fed. R. Civ. Pro. 50. The Court granted Defendant's motion at the end of the defense case, having deferred ruling following Plaintiff's presentation of evidence. The Court articulated on the record its reasoning for granting Defendant's motion, and this Order incorporates the Court's earlier pronouncement.

**I.    BACKGROUND**

Plaintiff B. Stanley McCullars brought this 42 U.S.C. § 1983 action against Defendant Grant Maloy, individually and in his official capacity as Clerk of the Circuit Court and Comptroller of Seminole County, Florida (the "**Clerk**"), for alleged First Amendment violations. (Doc. 1). The Court granted summary judgment in favor of Mr. Maloy in his individual capacity and the trial proceeded against Defendant in his official capacity. (Doc. 72). This suit arises from Plaintiff's controversial social media comments that precipitated the end of his employment with Defendant.

## A. The Posts

On March 16, 2017, State Attorney Aramis Ayala declared publicly that her office would not seek the death penalty in capital murder cases. Ms. Ayala made this statement in the wake of a tragic double-murder wherein Mr. Markeith Loyd killed his pregnant girlfriend and subsequently murdered Orlando Police Department officer LT Debra Clayton as she attempted to apprehend him.[1] Another officer was fatally injured in a traffic accident connected to this crime-spree.

On March 19, 2017, at approximately 10:30 p.m. while at home, Plaintiff posted comments from his Facebook account criticizing the State Attorney's decision. The Plaintiff posted a comment to another individual's Facebook page concerning Ms. Ayala's position on the death penalty.[2] Specifically, Mr. McCullars wrote that Ayala, the first African-American State Attorney in Florida, "should get the death penalty," and followed this post by writing Ms. Ayala "should be tarred and feathered if not hung from a tree." (Def. Ex. 6). Later that same night, Plaintiff made another Facebook post that said: "Yep, it was wrong for me to post that. I let my anger at her efforts to thwart justice get the better of me. No excuses." Plaintiff strenuously denies that the post was racially motivated, claiming that he was unaware of Ayala's race when he made the posts.[3] The posts were deleted by a third party shortly after they were posted.

---

[1] At trial State Attorney Ayala explained that her position was predicated, in part, upon the fact that the United States Supreme Court and Florida Supreme Court had stuck down the procedure employed in Florida in death-penalty cases.

[2] The individual who received Plaintiff's comments attended Florida A&M Law School, a predominantly African-American institution.

[3] For Defendant's Rule 50 motion, the Court accepts Plaintiff's position that he was unaware of Ms. Ayala's race, as patently implausible as that assertion may be in view

## B. The Impact of Plaintiff's Facebook Comments

Plaintiff's comments literally went viral. Almost immediately after the posts spread across the internet, Plaintiff McCullars was identified as a Clerk's Office employee. The next morning, March 20, 2017, the Clerk's Office's phones were ringing off the hook with complaints. Ms. Lia Denning, the head of human resources, testified that citizens calling the Clerk's Office were upset, with some people crying while others used profanity to express their outrage. Mr. McCullars' comments were largely characterized by concerned citizens as racist. Some citizens requested that the Clerk of Court, Mr. Maloy, return their call. The volume of telephone calls was so significant that two additional staff members were pulled from their duties to answer phone calls. Ms. Denning characterized the volume of telephone traffic as incredible, and the work environment was a nightmare with media converging outside the building. Ms. Amy Midyette, one of Plaintiff's co-workers, corroborated Ms. Denning's description of the volume of citizen complaints, adding that calls were so numerous that the Office's voicemail was overwhelmed. Additionally, the Clerk's Office received many emails related to the Facebook posts. Ms. Denning was, therefore, tasked with reviewing Plaintiff's social media posts as part of an on-going investigation.

General counsel for the Clerk's Office, Ms. Susan Dietrich, further corroborated Ms. Denning's testimony that on Monday morning the phones were constantly ringing with citizens complaining about Plaintiff's Facebook posts. Ms. Dietrich testified that personnel were removed from their normal duties for 2-3 days following the posts.

---

of the public discourse surrounding her statements concerning the death penalty and Plaintiff's choice of words.

Plaintiff's actions caused Ms. Dietrich to spend time researching First Amendment issues and reviewing the Clerk's options. Ms. Jenny Spencer, the Plaintiff's supervisor, called a meeting of 22 staff members to discuss the situation and to provide guidance on dealing with citizens and the media. Ms. Dietrich also related that protests were being threatened in response to the Facebook posts. And Ms. Dietrich had meetings with Mr. Maloy to discuss the situation.

Ms. Dietrich testified that Plaintiff's posts violated the Clerk's Code of Ethics (contained in the deputy clerk handbook), which provides: "We shall avoid any activities that would impugn the dignity of the clerk's office." (Def. Ex. 55, p. 3). Ms. Dietrich explained that Florida Rules of Court identify the Office of the Clerk of Court as an arm of the judiciary. Accordingly, Ms. Dietrich was concerned that Mr. McCullars' comments reflected poorly upon the integrity and impartiality of the Clerk's Office, thereby undermining the public's confidence in the administration of justice.[4] This concern was echoed by Mr. Maloy, the Clerk of Court, who explained that citizens access the court through the Clerk's Office, and Plaintiff's comments negatively impact upon public confidence in the administration of justice. Moreover, Plaintiff's comments had a negative impact on office morale and, if left unchecked, would have impacted the Clerk's ability to recruit and retain a diverse workforce. For example, Plaintiff's supervisor, Ms. Spencer is a highly educated Finance Director with vast experience in governmental accounting. Ms. Spencer testified that she could not continue to work with Mr. McCullars in light of his comments which she perceived as racist and impugning the dignity of the office. Mr.

---

[4] The Code of Ethics provides that deputy clerks "shall conduct [their] work without bias or prejudice based on any factor to include race, skin color, religion, age, [or] national origin . . . ." (Doc. 55, p. 4).

4

Maloy testified that the loss of Ms. Spencer, via her potential resignation, would have a detrimental impact on the operation of his office.

Plaintiff McCullars was not a line employee; he was a supervisor occupying the number two position in the finance department of the Clerk's Office. Plaintiff testified at trial and acknowledged that impartiality is important to the work of the Clerk's Office. Plaintiff McCullars admitted the importance of discharging his duties in an impartial manner and avoiding the appearance if bias. Mr. McCullars also acknowledged that the Clerk's Office is racially and ethnically diverse. He conceded that his comments on Facebook were made in anger, and he agreed that his comments did not address the merits of the death penalty or State Attorney Ayala's position on that subject. Plaintiff knew his comments generated public outcry, but he claims his suggestion that Ms. Ayala receive the death penalty or that she be tarred and feathered and hung from a tree was misconstrued by a handful of people who engaged in a crusade to have him fired. In contrast, Mr. McCullars' letter of resignation, submitted on March 22, 2017, stated:

> Please consider this letter as my official resignation with an effective separation date of April 3, 2017.
>
> My social media posts of last weekend resulted in the Clerk and Clerk staff spending resources answering questions from some members of the public. I believe my resignation will help the Clerk's Office to more quickly return to the people's business.
>
> . . . .

(Def. Ex. 50).

### C. Community Leaders Respond

State Attorney Ayala testified that on March 19, 2017, she began receiving calls by people who had seen Plaintiff's Facebook posts. Ms. Ayala took the threat literally,

5

and she was offended and concerned for her safety and for the safety of her children.[5] Ms. Ayala went to Plaintiff's Facebook page, clicked on his profile, and saw that he was employed by the Clerk of Court.[6] On Monday morning, Ms. Ayala directed her staff to call Mr. Maloy to express her displeasure. Mr. Maloy testified to the importance of maintaining a positive working relationship with the community and its leaders, including Ms. Ayala, and how Plaintiff's posts caused him to apologize to the State Attorney.

Other community leaders beyond State Attorney Ayala voiced their concern to the Clerk of Court. By March 20, 2017, the day after Plaintiff's Facebook comments, the Orange County Democratic Party passed a resolution condemning Mr. McCullars' comments, resolving that "the Orange County Democratic Party expresses its outrage over the terroristic threat made by Stan McCullars towards State Attorney Aramis Ayala, and calls upon Clerk Grant Maloy to terminate Stan McCullars immediately." (Def. Ex. 28). This resolution was sent to Mr. Maloy on March 22, 2017 at 8:44 a.m., three days after the Facebook post. (Def. Ex. 47). The negative impact from Plaintiff's comments did not subside quickly. Plaintiff's friend and former co-worker, Ms. Danalee Ellner testified that the atmosphere in the office after Mr. McCullars' posts was like a "grenade" went off, with the buzz about it lasting for weeks.

Pastor Roman Oliver, a community leader in Sanford, Florida, also testified at trial. Pastor Oliver spent a career as an educator and administrator before taking a leadership

---

[5] Ms. Ayala explained that it has become common for people to post their intentions to commit acts of violence on Facebook prior to carrying out an attack. Accordingly, she took Mr. McCullars' comments to be threatening.

[6] The Plaintiff denies that his Facebook page reflects that he worked for the Clerk of Court.

role at Saint Paul Baptist church in Sanford.[7] Pastor Oliver is active in the African-American community on issues of economic, social, and political justice. He was involved in organizing peaceful protests over the killing of Trayvon Martin, an African-American teenager shot by George Zimmerman as he walked home from a convenience store where he had purchased candy. Pastor Oliver quickly learned of Mr. McCullar's posts and his affiliation with the Clerk's office. Plaintiff's position in the judicial system concerned Pastor Oliver and other community leaders, and they met with Mr. Maloy. Because the Clerk of Court had placed Mr. McCullars on administrative leave, no protests took place. However, Pastor Oliver testified that had the Clerk's office declined to act, peaceful protests would have ensued.

Florida Representative Geraldine Thompson testified as an expert witness for the Defendant on African-American history and culture, including the prevalence of lynching in Florida and more particularly in Central Florida. After providing a comprehensive history of this dark chapter in American history, Representative Thompson opined that it is reasonable to foresee that the African-American community would interpret Plaintiff's statement that Ms. Ayala should be tarred and feathered and hung from a tree to be a reference to lynching.[8] Representative Thompson also provided a scholarly history of racial tension and segregation in Sanford, where the Seminole County Courthouse is located. She concluded her expert testimony by explaining how the Sanford community reacted to the killing of Trayvon Martin and how Plaintiff's comments, coming a year later,

---

[7] Saint Paul is the oldest African-American church in Florida.

[8] Lynching was a form of mob violence typically involving hanging a person from a tree without due process. It was extrajudicial killing typically perpetrated against an African-American.

7

would elicit public outcry in the community. Representative Thompson explained how the African-American community has mistrust for the judicial system, making Plaintiff's comments capable of undermining confidence in the Courts.

## II. STANDARD OF REVIEW

Judgment as a matter of law should only be granted if no objectively reasonable jury, based on the evidence and inferences adduced at trial and through the exercise of impartial judgment, could reach the verdict reached. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Stated differently, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in its favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). However, where there is substantial evidence in the trial record which would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010). In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences derived therefrom in the light most favorable to the non-moving party. *Brown*, 597 F.3d at 1173. Importantly, the district court must not make credibility determinations or weigh evidence, as these are functions reserved for the jury. *Id.* Rule 50 is clear in its procedure. Before a case is submitted to the jury for consideration, a party may move for judgment as a matter of law on any issue which is not supported by legally sufficient evidence. Fed. R. Civ. P. 50(a).

### A. First Amendment Analysis

#### 1. *Comments Made as Employee or Private Citizen*

The Court must determine whether Plaintiff's comments were made within the scope of his employment or in his capacity as a private citizen. When government employees speak "as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). On the other hand, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The *Garcetti* Court based this distinction on the long-recognized need for public employers to have discretion in controlling their operations:

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422–23. Public employee speech "ordinarily within the scope of [the] employee's duties" is therefore not afforded First Amendment protection. *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

The speech at issue in this case occurred when Plaintiff was home, using his personal computer. The Facebook comments do not reflect Plaintiff is speaking as an employee of the Clerk of Court. Moreover, the posts concerned Plaintiff's opinion regarding, and response to, a Florida prosecutor's public statement and had nothing to

9

do with Plaintiff's professional duties. Therefore, the Court holds that Plaintiff's speech was not made in his official capacity.

### 2. Pickering *Balancing Test*

Next, the Court addresses the framework set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968). It is well-settled that a public employer may not fire an employee "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To prevail on a wrongful termination claim based on protected speech, an employee must show, in part, that he or she (1) suffered an adverse employment action (2) because the employee engaged in protected speech. *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000).

Courts employ the so-called *Pickering* balancing test to discern whether a government employee's speech qualifies for First Amendment protection. Before any balancing, though, the Court must decide whether Plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern," triggering First Amendment protection. *Rankin*, 483 U.S. at 384 (quoting *Connick*, 461 U.S. at 146). This determination is made in view of "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 384–85 (same). The Court holds that Plaintiff's speech concerning the State Attorney's stance on the death penalty, no matter how misunderstood Plaintiff's understanding of Ms. Ayala's position may have been, is speech on a matter of public concern. *See Rankin*, 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). Plaintiff's statements criticized a public official for a publicly-

announced decision that generated significant media attention and spawned a clash between a Florida prosecutor and Florida's Governor that went up to the Florida Supreme Court.[9] The Court therefore finds that Plaintiff's speech addressed a matter of public concern, and next turns to the *Pickering* balancing test.

To prevail on his wrongful termination claim, Plaintiff must show by a preponderance of the evidence that his "first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees." *Stanley*, 219 F.3d at 1288. "In striking this balance, [the Court] consider[s] these factors: '(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made.'" *Id.* at 1289 (quoting *Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir. 1989)). This balancing act requires a fact-intensive inquiry guided by few, if any, hard and fast rules. *Pickering*, 391 U.S. at 569.

Other Courts have suggested factors to consider in applying the *Pickering* balancing test. The Second Circuit in *Melzer v. Board of Education*, 336 F.3d 185 (2d Cir.

---

[9] The Court pauses to note that, although unpleasant, Plaintiff's posts do not constitute an unprotected "true threat"—especially after giving Plaintiff the benefit of the doubt as required at this stage. The First Amendment does not protect all speech touching on matters of public concern. For instance, "true threats"—"statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"—are not entitled to First Amendment protection. *Virginia v. Black*, 538 U.S. 343, 359 (2003). But while "true threats" are not protected, "political hyperbole" is. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court cannot find that the posts constituted a "true threat." *See Specialty Malls of Tampa v. City of Tampa*, 916 F. Supp. 1222, 1227 (M.D. Fla. 1996).

2003), directs the district court to consider whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 197; *see also, Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015) (the inquiry involves a "sliding scale" in which the amount of disruption a public employer must tolerate is proportionate to the importance of the speech to the public). The district court in *Buker v. Howard County*, Nos. MJG–13–3046, MJG–13–3747, 2015 WL 3456750 (D. Md. May 27, 2015), *aff'd Grutzmacher, et al. v. Howard County*, 851 F.3d 332 (4th Cir. 2017), held:

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Id.* at *3 (citations omitted).

The Court begins by assessing Plaintiff's interest in making the posts. Plaintiff undoubtedly had a legitimate interest in speaking on a matter of public concern. Plaintiff's posts, as an "expression on public issues '. . . rest[] on the highest rung of the hierarchy of First Amendment values." *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982); *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). On the other hand, the "vulgar" and caustic nature of the posts somewhat weakens Plaintiff's interest in making them. *See Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994)

("[T]he manner of a public employee's speech is an important element in the *Pickering* balance. Here, the outcome of a *Pickering* balance is especially uncertain because the manner of [the plaintiff's] speech was vulgar, insulting, and defiant." (citation omitted)); *see also Snipes v. Volusia Cty.*, 704 F. App'x 848, 854 (11th Cir. 2017) ("[T]here are many ways to communicate ones' thoughts, and the vulgar, derogatory phrases used by [appellant] weigh against him."). And while the Supreme Court has recognized "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," *Garcetti*, 547 U.S. at 419, Plaintiff's posts do not implicate this consideration as there is little evidence that the views Plaintiff expressed were particularly "well[ ]informed." In fact, Plaintiff admitted at trial that he did not attempt to engage in a thoughtful discourse on the merits of the death penalty or Ms. Ayala's position in that regard. Rather, he lashed out in anger with violent rhetoric that quickly went viral.

One aspect of Plaintiff's position weighs slightly in his favor. Plaintiff had some—albeit not the greatest—contact with the public. Plaintiff met with bankers and attended committee meetings open to the public. But Plaintiff's job required little direct public contact, which means that his "burden of caution" with respect to his public speech was less than an official with significant public contact. *See Rankin*, 483 U.S. at 390–91; *see also, Sims v. Metro. Dade Cty.*, 972 F.2d 1230, 1237 (11th Cir. 1992) ("[W]hen the employee serves in a sensitive capacity that requires extensive public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning.").

Next, the Court considers Defendant's interests in censuring Plaintiff for the posts. The Clerk's Office requires "a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." *See Garcetti*, 547 U.S. at 418. Another weight on the scales is the prospect of disharmony among co-workers, manifested here by Ms. Spencer, Plaintiff's supervisor, testifying that she could no longer work with Plaintiff in light of his "racist" posts. *See Rankin*, 483 U.S. at 388. The evidence is overwhelming that the posts "interfere[d] with the regular operation of the [Clerk's Office]" because the barrage of angry phone call and email complaints disrupted several employees' work, *See Rankin*, 483 U.S. at 388. Furthermore, Defendant saw the posts as damaging the integrity of the Clerk's Office, which is corroborated by several witnesses, including Defendant's expert witness, and which Plaintiff acknowledged at trial. *Rankin*, 483 U.S. at 389 (suggesting that speech "discredit[ing]" a public employer would tend to justify remedial measures).

It is well-settled that a "government's legitimate interest in avoiding disruption does not require proof of actual disruption." *Smopes*, 704 F. App'x at 852. "Rather, a '[r]easonable possibility of adverse harm is all that is required." *Id.* In *Snipes*, the County did not receive complaints or demands that the appellant be fired, nor were any rallies or protests held. *Id.* However, Reverend Durham, President of the Daytona Beach Black Clergy Alliance, testified that had Snipes not been fired, "I certainly think that we would have probably moved forward with some sort of either demonstration or action . . . in the form of a protest rally." *Id.* The potential for disruption in *Snipes* was sufficient to justify the government's action in response to Mr. Snipes hateful comments concerning the death of Trevon Martin. *Id.* Conversely, when actual disruption to the government

employer's operations occurs, this constitutes persuasive evidence that the government has met its burden under the *Pickering* balancing test. *Melzer*, 336 F.3d at 197.

Here, Plaintiff employed Facebook, a public forum, by commenting on another Facebook user's page and advocating that the State Attorney receive the death penalty for her views and that she be tarred and feathered and hung from a tree. The public outcry in response to these vulgar comments was immediate and overwhelming. By the following morning the Office of the Clerk of Court was inundated with telephone calls, emails, and voice messages by upset citizens demanding action. The State Attorney had complained to the Clerk of Court, community leaders had insisted upon meeting with the Clerk, the Democratic Party of Orange County passed a resolution condemning the comments and calling for Plaintiff's termination, the threat of protests loomed, and the media was aggressively covering the story. In the midst of this turmoil, the Finance Department, lead by Ms. Spencer, was preparing a comprehensive financial report which demanded the full attention of three senior members of the Finance Department, including Mr. McCullars. None of these senior employees could attend to that business. Mr. McCullars was placed on administrative leave and Ms. Spencer was busy dealing with the crisis created by Mr. McCullars ill-conceived internet rant.

Perhaps the most damaging by-product of Mr. McCullars' comments was to call into question whether the Seminole County Clerk of Court—the right arm to the judiciary in that county—was capable of discharging its important duties in an impartial manner. Mr. Maloy and his staff responded to this turmoil with composure and consummate professionalism and ultimately regained the public's trust and confidence. However, "it is not necessary 'for an employer to allow events to unfold to the extent that the disruption

of the office and the destruction of working relationships is manifest before taking action." *Buker*, 2015 WL 3456750, at *10.

Plaintiff McCullars was presented with a letter containing what the Clerk of Court described as incentives for resignation. (Plf. Ex. 13). Plaintiff contends that he was terminated via this letter. The Court need not resolve this dispute, because the Court finds that in applying the *Pickering* balancing test to the specific facts of this case, Plaintiff's speech is not entitled to protection under the First Amendment to the United States Constitution.

### III. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Judgment as a Matter of Law is **GRANTED**.
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Grant Maloy and close this case.

**DONE AND ORDERED** in Orlando, Florida on March 25, 2019.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record